### ROTHE et al. v. JONES. (No. 6679.)

(Court of Civil Appeals of Texas. San Antonio. Feb. 1, 1922.)

**1. Master and servant ⬅⟿72½—Judgment for traveling expenses held unwarranted.**

Where defendant and plaintiff communicated concerning employment of plaintiff, and defendant informed plaintiff that he would pay traveling expenses if plaintiff came to the city where defendant was situated and they "did business," and an alleged contract of employment was entered into and plaintiff sued for three weeks' salary and traveling expenses, a judgment allowing him traveling expenses but denying recovery of salary was inconsistent, in that payment of expenses depended upon employment.

---

⬅⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**2. Partnership �köm44 — Burden on plaintiff to prove partnership on which action based.**

In an action to recover on the theory that defendants were partners, the burden was on the plaintiff to prove this relationship by affirmative evidence.

**3. Partnership �köm49—Need not be shown by direct evidence but may be shown by circumstances.**

Partnership need not be shown by direct evidence, but may be shown by circumstances— by the acts and conduct of the parties.

**4. Partnership �köm216(3)—Defendants sued on contract not to be held as partners solely on proof of contract with third person.**

Plaintiff, who in suing defendants seeks to hold them alone as partners on a contract, cannot so hold them solely on proof of a contract with a third person, who is not alleged to be a partner or acting for the partnership, and which contract the evidence shows was made without their knowledge and consent.

**5. Partnership ⊦köm43—All of several persons operating under a trade-name held liable to third person for acts of each.**

If persons operating together under a trade-name each held himself out, or permitted himself to be held out, as an official of the company, and holding a beneficial interest in the business in such way as to share in the profits and losses thereof, all may be held to the third person for acts of each, if within the apparent scope of his authority and the third person had no notice of limitations on such authority.

Error from Bexar County Court; John H. Clark, Judge.

Action by R. E. Lee Jones against A. C. Rothe and another. Judgment for plaintiff, and defendants bring error. Reversed and remanded.

Guy Cater, of San Antonio, for plaintiffs in error.

Guy S. McFarland and W. H. Kennon, both of San Antonio, for defendant in error.

SMITH, J. The Consolidated Oil Lease Company, domiciled at San Antonio, was engaged in buying and selling oil leases, operating under a declaration of trust. J. H. Flynn appears to have been the trustee and president of the concern, and it may be inferred from the testimony that N. W. Singer was, nominally, its vice president, and A. C. Rothe its general manager, at least in name. Flynn, however, seemed to have been the actual and controlling head of the company. The declaration of trust under which the concern was operating does not appear in the record, and its purposes or effect are in no manner shown. It is shown, however, that Flynn, Singer, and Rothe each had shares of beneficial interest in the trust.

In April, 1920, the company advertised in the newspapers for a sales manager for a "large business," at a salary "of from $10,- 000 to $25,000 per year." One of these advertisements caught the eye of R. E. Lee Jones, then a resident of Louisiana, who was so impressed by it that he at once wrote the company for particulars, advising incidentally that he had had many years' experience on the road as an insurance salesman, at a salary of from $10,000 to $15,000 a year, "producing $2,000,000 and more of business per year," but had "retired some years ago, and gone to farming, but desired to rent out his farm and go back into business." This brought a hasty reply from the company, in a letter dictated by Flynn but signed with the name of Singer, as vice president, in which, apparently not to be outdone in the matter of large figures, it was claimed that "the company has in the last 60 days reaped a reward of $80,000;" that it had over 400,- 000 acres of oil leases, and "owned outright 3,000 acres in the Somerset field, which was proven territory, which they were developing themselves." The commissions the company paid its salesmen were then quoted; Jones was invited to invest in the business, and was promised the position of sales manager, if he "was able to make the required investment"; and it was suggested that he come over to San Antonio and talk it over in person, in which event, and if a deal was made, the company would pay his expenses. This letter from the company brought a prompt response from Jones, who asked for further particulars, reiterated the first recital of his success as an insurance salesman, and the large returns his efforts brought to the company employing him, and asked how much he would be required to invest in the company, stating in that connection that he did not have much available cash, "as most of his money was tied up in his farm, worth about $40,000 or $50,000." From this point the correspondence grew fast and furious, soon flaming into telegraphic communication. The company advised Jones that it had added a $200,000 investment to its assets, and the latter advised the former that in his last venture he had organized a force that "produced over $3,000,000 worth of business in three months." At intervals in the contest the company again urged Jones to come over to San Antonio, promising if he did so, and did business with it, it would pay his expenses both ways, and finally Jones suggested that the parties split the expenses of his prospective trip, and to this end asked the company to send him draft for $100, to which proposal the company replied that it was "dumbfounded" at this request, as it "was backed by $250,000," and nonchalantly referred him to two of San Antonio's leading banks, as well as to the two largest mercantile agencies in the United States. This gentle rebuke seemed to put a quietus on

Mr. Jones' fears, as the latter finally came on to San Antonio at his own expense, and made a trade with Flynn, according to his testimony, whereby he was to work for the company as a salesman at a salary of $50 a week, but was not required to invest in the business. He had no dealings with Singer or Rothe, whom he ignored, but dealt entirely with Flynn, whom he had been affectionately addressing in his letters as "My dear Flynn," and with whom, as president of the company, he had had most of his correspondence. In fact, all the letters to Jones appear to have been dictated by Flynn. One of them had been signed with Singer's name as vice president, but Singer testified that this was not his signature; that he did not sign it, nor authorize any one to sign it for him. Several of the letters were signed by Rothe as "general manager and trustee," and he admitted his signature to all but one of these letters, whereby he became either actively, passively, or unwittingly (as he contends) sponsor for their contents. All the other letters were signed by Flynn as president. Undoubtedly, from the testimony, Flynn was actively in full charge and control of the business of the company, and was looked to by Jones as such, and while Singer was nominally and in name its vice president, and Rothe its general manager, each testified that he was merely an employé at a salary of $50 a week.

When he made his trade with Flynn, Jones went back to his Louisiana home, arranged his affairs there, and returned to San Antonio to take up his work for the company, reporting to Flynn. For some reason, however, Flynn did not set him to work, putting him off from day to day, according to Jones, for some three weeks, when it seems that Flynn disappeared with the company's assets and has not been heard from since. Jones then called on Rothe and Singer to pay his salary and expenses to San Antonio and back to Louisiana, which they refused, and Jones brought this suit against Rothe and Singer, as partners, for three weeks' salary and $92.29 expenses. Upon a trial before the court without a jury he obtained judgment against the defendants jointly for $92.-29, the amount of his expenses.

[1] The evidence of an agreement on the part of the company to pay Jones' expenses was quite unsatisfactory, even if sufficient to raise the issue. It was embraced in letters and telegrams, and it may be said that the promise was based upon the contingency that Jones "did business" with the company upon his arrival at San Antonio, and it is by no means clear that "doing business" did not contemplate an investment in the company, which was never made. A considerable portion of the correspondence covered a scheme by which it is made apparent that Jones was to sell or lease his farm for oil purposes, and it is not clear that his own business did not bring him to San Antonio. The question of whether or not the company obligated itself to pay Jones' expenses, however, is one of fact, of course, to be determined by the court, as it was. The court found for Jones on this issue, and yet failed to find for him that the company became liable to him for the three weeks' salary. The liability of the company for Jones' expenses was wholly dependent upon its liability for his salary. In no event was it to reimburse him for his expenses, unless he "did business" with it. If hiring to the company was doing business with it, as contemplated in the agreement, then he should have had judgment for his salary. If not, then he should not have recovered his expenses. The judgment is inconsistent, for Jones is entitled to both his salary and his expenses, or to neither salary nor expenses.

[2, 3] In his petition Jones alleged that Rothe and Singer were partners, doing business in the name of the Leasing Company, and sought to recover from them as such. Rothe and Singer answered under oath, denying partnership. The burden was upon Jones to prove this relationship between the defendants, by affirmative evidence. It was not necessary that the fact be shown by direct evidence. It is more often shown by circumstances—by the acts and conduct of the parties. But Jones did not in this case respond to the burden assumed by him to show partnership, either in his pleadings or evidence.

[4] If Rothe and Singer were partners, it was because of their relationship to Flynn. The partnership structure was triangular in form, so to speak, of which Flynn was an integral, an essential part. If the partnership was bound, it was because of the acts of Flynn, with whom alone Jones dealt in making his final contract. But Jones did not sue Flynn, or even allege that he was one of the partners, or that he was acting for the partnership. He sought to hold Rothe and Singer alone, as partners, upon a contract which the evidence shows was made with Flynn, and without the knowledge or consent of Rothe and Singer. According to his allegations, Rothe and Singer constituted the whole partnership structure, of which Flynn was no part, and yet in his proof he depends entirely upon a contract made with Flynn alone. He will not be permitted to do this.

If Jones had alleged that Flynn, Rothe, and Singer together comprised the partnership, that the contract in question had been made with Flynn, and that this act of Flynn as one of the partners was binding alike upon all the partners, a different case would be presented. But he has not done this. He simply alleged that Rothe and Singer were partners, and that the contract was made

with them as such, and under these allegations seeks to prove up a contract made alone with Flynn.

[5] If Flynn, Rothe, and Singer were operating together under a trade-name, each holding himself out, or permitting himself to be held out, as an official of the company, and holding a beneficial interest in the business in such way as to share in the profits and losses thereof, we see no reason why all should not be held to third persons for the acts of each, if such acts are within the apparent scope of his authority and the third person has no notice of limitations upon such authority.

The judgment is reversed, and the cause remanded for another trial.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes